MAXIMILIAN GAGNE v. MINNEAPOLIS STREET RAILWAY COMPANY and Others.

June 28, 1899.

Nos. 11,704—(185).

77   171
f82   20

### Street Railway—Bicycle Rider—Contributory Negligence.

In an action for damages for the death of plaintiff's intestate, caused by the alleged negligence of the motorman of one of defendant's cars, *held*, that the evidence was conclusive that the deceased was guilty of contributory negligence.

### Evidence of Wilful Negligence.

Also, that there was no evidence that the motorman was guilty of any wanton or wilful negligence in failing to make proper efforts to avoid injury after he discovered the deceased in a place of danger.

Action in the district court for Hennepin county by plaintiff, as administrator of the estate of Ferdina Gagne, deceased, against Twin City Rapid Transit Company, St. Paul Street Railway Company, and Minneapolis Street Railway Company, doing business as Twin City Rapid Transit Company, to recover $5,000 on account of the death of decedent. The case was tried before McGee, J., and a jury, which rendered a verdict for $2,500 in favor of plaintiff and against Minneapolis Street Railway Company,—the action having been dismissed as against the other defendants. From an order granting a motion for judgment notwithstanding the verdict in favor of defendant, plaintiff appealed. Affirmed.

*Penney & McMillan* and *A. B. Ovitt,* for appellant.
*Koon, Whelan & Bennett,* for respondent.

MITCHELL, J.

Plaintiff's intestate was killed by one of defendant's cars on the Interurban Line at or near the intersection of University and Malcolm avenues, and this action was brought to recover damages on the ground that the death of the deceased was caused by the negligence of defendant's motorman who was operating the car. The trial resulted in a verdict for the plaintiff, and on defendant's motion the court, under Laws 1895, c. 320, ordered judgment in favor of the defendant notwithstanding the verdict, whereupon the plaintiff appealed.

The accident occurred about three o'clock in the afternoon. The deceased was a middle-aged man, in full possession of all his faculties, and entirely familiar with the location and the manner in which the cars were run on that line. University avenue at that point is 120 feet wide. In the center of it the defendant has double tracks, on the northerly one of which the cars going west, or to Minneapolis, run, and on the southerly one the cars going east, or to St. Paul. The Interurban cars are large and heavy, weighing about 30,000 pounds, and one passes each way at intervals of from six to ten minutes. The surrounding country being suburban in its character, the cars are accustomed to run at a higher rate of speed than in the more thickly-populated parts of the two cities. This is especially true of west-bound cars, there being a down grade of three per cent. from Raymond avenue to Thirtieth street, the cross street next west of Malcolm avenue. The distance between the inside rails of the two tracks is 7 feet, but, as the cars project 22 inches over the rails, the clear space between two passing cars going in opposite directions would only be 4 feet 4 inches. The evidence shows that the width of the handle bars of a bicycle is from 22 to 24 inches. Hence a person riding on a bicycle in the space between the tracks would, under any circumstances, have to steer carefully to go safely between two passing cars. Moreover, as this space was neither prepared nor intended for a bicycle path, a rider would frequently have to deviate

from a straight line in order to avoid obstacles, and also to avoid the trolley poles which are set every 135 feet in the center of the space between the tracks; the distance between a trolley pole and a passing car being only $16\frac{1}{2}$ inches.

From these facts the extreme danger of attempting to ride a bicycle in the space between the tracks must be perfectly apparent. We think that to do so under any ordinary circumstances ought to be held negligence as a matter of law.   On the day in question the deceased started from near Raymond avenue to ride on his bicycle westward to Minneapolis.   For no apparent reason, except that it was smoother than the remainder of the street, he undertook to ride between the tracks.   When he had gotten part way down the grade a west-bound car reached the top of the hill near Raymond avenue.   The motorman, of course, saw him.   The evidence, in our judgment, is conclusive that the gong on the car was being rung as the car descended the grade.   Some of plaintiff's own witnesses testify that they heard it when the car was still at least half a block distant from the deceased.   He rode sometimes near the south rail of the north track, and sometimes near the north rail of the south track, apparently without the least effort by the use of any of his senses to ascertain whether a car was approaching him from behind, until he reached a point near the westerly intersection of University and Malcolm avenues, when, the west-bound car being already within 10 to 20 feet of him, he suddenly turned to the right to cross the northerly track, right in front of the approaching car; and upon getting upon the track he was instantly struck by the car and killed.

In our judgment, the evidence is conclusive that the deceased was guilty of contributory negligence so gross as to amount to extreme recklessness.   Therefore the only question remaining is whether there was any evidence to go to the jury upon the question whether the motorman, after he saw the deceased in a place of danger, was guilty of wanton or wilful negligence in failing to exercise reasonable care to avoid injuring him.

In support of the affirmative of this question, counsel for the plaintiff claim that there was evidence that the deceased, up to the time he attempted to cross the north track, rode continuously

near the south rail of the north track, and hence was in a place of danger all the time, and that the fact that he never looked back, or gave any indication that he heard the gong or knew that the car was approaching, ought to have . advised the motorman that he did not hear the signal, and was ignorant of the approach of the car. If the fact was, as claimed, that the deceased continuously rode near the south rail, we do not think this would have justified a finding that the motorman was guilty of any wanton or wilful negligence.

The car was in plain sight of the deceased, if he had looked in that direction. He had been warned of its approach by the sounding of the gong. There was no reason for the motorman to suppose that he had not heard it. The fact that he gave no visible indication of having heard the gong, or of being aware of the approach of the car, is of very little weight. Any one accustomed to ride on street cars, who is at all observant, must know that there is a very large number of bicyclers who ride between or near street-railway tracks, and who seem to think it is not "good form" to get out of the way of an approaching car, or to give any indication of their being aware of its approach, until the very last moment. If a motorman was required to stop or slow up in every such case until he was sure that the rider would get out of the way, it would be practically impossible to operate the cars so as to properly serve the public. Moreover, the deceased was riding a swift and noiseless vehicle, which was susceptible, by a mere pressure of the hand, of being turned aside in less time and with greater rapidity than a pedestrian could step aside. Under such circumstances, the motorman had a right to assume that the deceased could and would take care of himself.

But we think the evidence is conclusive that, when the deceased reached a point near the east crossing of University and Malcolm avenues, he changed his course, and rode near the north rail of the south track until he suddenly turned to  cross the north track in front of the car; thus leading the motorman, as he testifies, to suppose that he was giving him "the right of way." The only evidence relied on to rebut this is the testimony of two witnesses, also riding bicycles, who passed the deceased near trolley post A,

about 40 feet east of the easterly intersection of University and Malcolm avenues, and who testified that after they passed the deceased they turned their heads and looked back at him, and that he was still riding near the south rail of the north track. But this is not inconsistent with the testimony of the motorman, and those who corroborated him, that the deceased afterwards, and before attempting to cross the north track, was riding near the north rail of the south track. It is perfectly clear from the evidence that the car was so close to the deceased when he attempted to cross the track that no possible effort thereafter on the part of the motorman would have avoided the collision.

Order affirmed.